ON PETITION TO AMEND RULE I OF
the RULES GOVERNING the BAR.

No. M–78–81.

District of Columbia Court of Appeals.

May 5, 1981.

Harris, filed separate statement in which Kelly, Kern and Nebeker, JJ., joined.

Kern, J., filed separate statement.

Before NEWMAN, Chief Judge, and KELLY, KERN, NEBEKER, HARRIS, MACK, FERREN and PRYOR, Associate Judges.

### ORDER

PER CURIAM.

On consideration of the petition of the District of Columbia Bar to amend Rule I of the Rules of this Court Governing the Bar of the District of Columbia, the oral and written responses thereto, and of the order of this Court dated January 19, 1981, which, *inter alia*, granted, pending further order of the Court, the Bar's motion for an order respecting the conduct of activities pending a ruling by the Court on the aforesaid petition, it is this 5th day of May, 1981,

ORDERED that the aforesaid petition of the Bar to amend Rule I is hereby denied, and it is

FURTHER ORDERED that the aforesaid order of January 19, 1981, insofar as it

granted the District of Columbia Bar's motion for an order respecting the conduct of the activities pending a ruling by the Court on the aforesaid petition, is hereby vacated effective July 1, 1981. See Rule VII, § 4 of the above-mentioned rules.

Separate statements follow.

HARRIS, Associate Judge, with whom KELLY,* KERN and NEBEKER, Associate Judges, concur:

On December 18, 1980, the results of two referenda which had been submitted to the active members of the District of Columbia Bar were announced. The one designated as Referendum No. 2 was phrased as follows:

Mandatory dues and assessments of the District of Columbia Bar shall be used only for the following purposes: admission of attorneys; their continued registration; discipline of attorneys; and, client security fund. Any other activities shall be funded by other means, including but not necessarily limited to voluntary contributions. If in the judgment of the Board of Governors, implementation of the foregoing requires a rules change, the Board is directed to petition the District of Columbia Court of Appeals to obtain such change.

That referendum was passed by a vote of 6,721 to 5,189.[1]

On December 24, 1980, the Board of Governors of the Bar filed a two-page petition, based upon the referendum, which proposed that a new § 3 be added to Rule I of our Rules Governing the Bar. That new section essentially would duplicate the language of the critical portion of Referendum No. 2. We stayed the effectiveness of the referendum pending our receipt and consideration of written and oral comments on the issues presented.

Section 4 of Rule VII provides in pertinent part that:

---

\* Judge KELLY concurs in this opinion except for Part V thereof.

1. There are three categories of membership in our unified (or mandatory) bar: active, inactive, and judicial. The total membership is approximately 34,000. Of those, somewhat

The result of a referendum as determined by a majority of the votes cast, . . . shall control the action of the Bar, the Board of Governors, the officers and committees.

Today, we terminate the existing stay effective as of July 1, 1981, and permit the implementation of Referendum No. 2 on that date. We conclude that there is no need to amend our Rules, and hence the Board of Governors' petition is denied. We also conclude that the implementation of Referendum No. 2 is subject to the continued effectiveness of § 3 of Rule IV, which authorizes the Board of Governors to perform certain functions essential to the day-to-day operations of the Bar as an organization.

I

There is no need for a detailed analysis of the historical steps which have led us to the present point. It should be observed, however, that for many years before the enactment of the Court Reorganization Act of 1970, a serious problem existed as to lawyer discipline in the District of Columbia. The only effective disciplinary mechanism lay within the United States District Court for the District of Columbia, but its disciplinary powers could not effectively reach a significant percentage of the total number of attorneys engaged in the practice of law here. Many lawyers believed that it was desirable to have a unified or mandatory bar to bring all attorneys within the reach of ready professional discipline. Some opposed the creation of a unified bar.

In 1970, Congress determined that this court should assume the customary role performed elsewhere by state supreme courts. Thus, as part of the Court Reorganization Act, Congress provided in what is now D.C. Code 1973, § 11–2501:

over 26,000 are active members. A significant, but not readily discernible, percentage of the active members have their principal locations in other than the metropolitan Washington, D.C., area. Only active members may vote on a referendum.

(a) The District of Columbia Court of Appeals shall make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion.

(b) Members of the bar of the District of Columbia Court of Appeals shall be eligible to practice in the District of Columbia courts.

(c) Members of the bar of the United States District Court for the District of Columbia in good standing on April 1, 1972, shall be automatically enrolled as members of the bar of the District of Columbia Court of Appeals, and shall be subject to its disciplinary jurisdiction. (July 29, 1970, Pub.L. 91–358, § 111, title I, 84 Stat. 521.)

In turn, this court became persuaded of the desirability of a unified bar to implement the objectives of § 11–2501(a). On April 1, 1972, we adopted a set of Rules Governing the Bar. The preamble thereto stated:

The District of Columbia Court of Appeals in the exercise of its inherent powers over members of the legal profession does hereby create, as an official arm of the court, an association of members of the Bar of the District of Columbia to be known as the District of Columbia Bar, and pursuant to its statutory authority governing admissions to the Bar promulgates the following rules for the government of the Bar and the individual members thereof[.]

Thus the District of Columbia Bar came into existence.[2] I believe that all of us who lived through the relevant years recognize that the overriding reason for creating a unified bar was bringing all of the jurisdiction's lawyers under one disciplinary system. To make the basic purposes of the unified bar visually apparent, attached hereto as Appendix A is a copy of the original organizational chart prepared by the first Executive Director of the District

of Columbia Bar. It reflects the intended structure of the Bar, progressing from this court to the Bar's officers, a Board of Governors, The Disciplinary Board (since renamed the Board on Professional Responsibility) with its subordinate entities, a Committee on Admissions, a Committee [on] Unauthorized Practice, and a Client Security Trust Fund. The smallest box on the chart refers to "Other Committees—As appointed by the Board of Governors."

While the four principal committees—the then-Disciplinary Board, the Committee on Admissions, the Committee on Unauthorized Practice, and the Client Security Trust Fund—function as direct arms of the court (although funded by dues), it was intended that the Bar otherwise basically should be autonomous, subject to a recognition of the fact that it, having been created by this court, is an organ of government. In setting the composition of the Board of Governors in § 1 of Rule IV, we provided:

The affairs of the Bar shall be managed and directed by a Board of Governors consisting of the officers of the Bar and the immediate past-president of the Bar, who shall be ex officio members of the Board, and fifteen members elected by members of the Bar in the manner prescribed by the By-laws.

An organization such as the District of Columbia Bar has certain inherent roles which it must fulfill in order to permit the organization to operate effectively. To remove any doubt as to them, we provided for the performance of a number of specified functions in § 3 of Rule IV:

The Board of Governors shall have general charge of the affairs and activities of the Bar. It shall have authority to fix the time and place of the annual meeting of members of the Bar; to make appropriations and authorize disbursements from the funds of the District of Columbia Bar in payment of the necessary expenses of the Bar; to engage and define the duties of employees and fix their

---

**2.** The first paragraph of § 1 of Rule I provides:

All persons admitted to practice law in the District of Columbia are hereby organized as an association to be known as the "District of Columbia Bar" subject to the provisions of the rules hereinafter set forth.

compensation; to receive, consider and take action on reports and recommendations submitted by committees, and the assembly of members of the Bar at any annual or special meeting; to arrange for publication of an official Bar bulletin or journal; to conduct investigations of matters affecting the Bar; to fill vacancies, however arising, in the membership of the Board of Governors, or in any office, subject to the limitations of Rule III, section 3, and in such case the person appointed to fill such vacancy shall hold office until the completion of the next regular election; and to adopt By-laws and regulations, not inconsistent with these rules, for the orderly administration of the Bar's affairs and activities.

It is doubtful that many of us anticipated that the unified bar would grow to a membership of some 34,000 in just eight years. Be that as it may, with a Board of Governors comprised of 20 voting members, obviously a high degree of power over Bar affairs and funds is vested in a small number of elected officials of the Bar. To guard against policies adopted by the Board of Governors which might prove unacceptable to a majority of the Bar's overall membership, we established referendum procedures in Rule VII. They provide:

Section 1—GOVERNORS MAY INITIATE.

The Board of Governors may at any time, by the affirmative vote of two-thirds of its membership, refer to the active members of the Bar for determination by mail ballot, any question of Bar policy.

Section 2—ASSEMBLY MAY INITIATE.

The Board of Governors shall, in like manner, submit for determination by the active members of the Bar, any question of Bar policy, including proposed changes in the rules or By-laws of the Bar, whenever directed so to do by resolution adopted at any annual or special meeting of the Bar by the affirmative vote of not less than two hundred members; provided that no such resolution directing the

Board of Governors to propose changes in the rules shall be effective unless adopted at two consecutive meetings of the assembly.

Section 3—MEMBERS MAY INITIATE BY PETITION.

The Board of Governors shall, in like manner, submit for determination by the members of the Bar, any question of Bar policy, including proposals for changes in the rules or By-laws, whenever directed so to do by a petition signed by not less than three hundred active members of the Bar.

Section 4—PROCEDURE.

Ballots for use in any such referendum shall be prepared, distributed, returned and counted in accordance with regulations prescribed by the Board of Governors. The result of a referendum, as determined by a majority of the votes cast, when duly ascertained shall be published by the Board of Governors in the official Bar bulletin, and shall control the action of the Bar, the Board of Governors, the officers and committees.

## II

When the unified bar was created, the District of Columbia had many voluntary bar associations, of which by far the largest was the long-established Bar Association of the District of Columbia. For many years it had been providing a lawyer referral service to aid those in need of counsel; for many years it and the other voluntary bar associations (including a variety of specialized bar associations such as the Federal Communications Bar Association) had conducted continuing legal education programs. It was not our intention that the unified bar should stifle or compete with voluntary bar associations. Thus, when we adopted a broad set of purposes for the District of Columbia Bar, we specifically directed among other things that the unified bar should encourage the activities of those associations. Our broad statement of the Bar's purposes as set forth in § 2 of Rule I reads as follows:

The purposes of the Bar shall be to aid the court in carrying on and improving

the administration of justice; to foster and maintain on the part of those engaged in the practice of law high ideals of integrity, learning, competence in public service, and high standards of conduct; to safeguard the proper professional interest of the members of the Bar; to encourage the formation and activities of volunteer bar associations; provide a forum for the discussion of subjects pertaining to the practice of law, the science of jurisprudence and law reform, and the relations of the Bar to the public, and to publish information relating thereto; to carry on a continuing program of legal research and education in the technical fields of substantive law, practice and procedure, and make reports and recommendations thereon; to the end that the public responsibility of the legal profession may be more effectively discharged.

The Bar grew, both in size and in the scope of its activities. It now has annual dues income of nearly $2 million, a total annual budget of approximately $2.4 million, and approximately 60 employees. A series of Boards of Governors undertook a wide variety of activities, some of which unquestionably had not been anticipated by the court when the mandatory bar was created. Many lawyers approved of those activities; many lawyers disapproved of some of them; many lawyers paid little attention to them. This court as an institution neither approved nor disapproved of the Bar's various activities.

Then, on February 15, 1980, an event occurred which planted the seed for the dispute now before us. On that date, the Board of Governors formally petitioned the court for an increase in the authorized dues ceiling from the then-existing $50 per year "to at least $150" per year.[3] That request proved to be a call to arms for a substantial segment of the Bar which had disapproved of a variety of the Bar's activities and expenditures. Illustratively, $58,000 per year from dues is being expended on the Citizens' Advisory Committee.[4] The *District Lawyer,* a bimonthly magazine, is published by the Bar at a net cost—made up from dues—of over $100,000 per year.[5] Extensive continuing legal education programs and lawyer referral and information services have been funded in significant part by mandatory dues. Out of dissatisfaction with various actions being taken by the Board of Governors, and out of concern as to what the Board of Governors might do with potential annual dues revenues in excess of $5 million, came two referenda which duly were proposed by members of the Bar.

3. Later, pending the results of Referendum No. 1 (discussed below), we authorized an increase in the dues ceiling to $75 per year. Annual dues now are $65 for active members of the Bar.

4. Judge FERREN, who believes that Referendum No. 2 should not be permitted to take effect, characterizes the role of the Citizens' Advisory Committee as "to help assure lawyer accountability by putting hard questions from the client perspective." (Statement by FERREN, J., *post,* at 31.) In its first publication (Winter 1981 issue), the CAC describes itself as follows:

    WHAT THE CAC IS
    The District of Columbia Bar's Citizens' Advisory Committee is an advisory group of non-lawyers which formally advises the D.C. Bar and its Board of Governors, the legal profession, and the Courts about ways they can better serve the public. After eight years of operations, the CAC is still the only established committee of this kind in the country.
    Founded in 1973, to give non-lawyers a voice in matters relating to the administration of justice, the CAC has the authority to undertake investigations and other initiatives; and to issue reports, recommendations and public statements.
    Thirty-three non-lawyers make up the Advisory Committee, which has a staff of two persons and a Fiscal Year 1981 budget of $58,000 provided by the D.C. Bar. Its offices are on the eighth floor, 1426 H Street, N.W., Washington, D.C. 20005; (638–1500).
    The use of mandatory dues for activities such as those undertaken by the CAC raises serious First Amendment questions. *See, e. g., Abood v. Detroit Board of Education,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). The implementation of Referendum No. 2, however, will moot this problem.

5. For the fiscal year ended June 30, 1980, the expense of the six issues of the *District Lawyer* was $206,589. The Bar's total advertising income for the year was $102,384.

### III

The first referendum dealt with the requested dues increase it asked the membership to vote "yes" or "no" on the following proposal:

The Board of Governors is directed to amend its petition to the District of Columbia Court of Appeals to seek an increase in the dues ceiling for the D.C. Bar to not more than $75, instead of "at least $150," as contained in the petition of February 15, 1980 to the Court.

Referendum No. 2, quoted on page 522, supra, sought a major change in the direction of the Bar's activities. It asked the membership to vote on limiting the use of mandatory dues to attorney admission, registration, and discipline, and to the Client Security Trust Fund. It proposed that other activities be funded by other means, including voluntary contributions.

The issues were aired fully. The October-November 1980 issue of the Bar Report (the Bar's other bimonthly publication, which alternates with the District Lawyer) devoted eight pages to expressions of opinion on each side of the referenda. A special membership meeting of the Bar was held on October 29, 1980, to discuss the referenda. Additionally, the subjects were discussed widely among individual members of the Bar.

The results of the referenda do not lend themselves to euphemistic characterization. Rightly or wrongly, wisely or unwisely, they constituted a repudiation of many decisions made by successive Boards of Governors through the years since the formation of the mandatory bar in 1972. On Referendum No. 1 (as to the dues ceiling limitation), there were 9,168 "yes" votes and 2,778 "no" votes. On Referendum No. 2 (as to the limitation on the use of mandatory dues), as noted, there were 6,721 "yes" votes and 5,189 "no" votes.

The Board of Governors' subsequent perfunctory petition proposing that Rule I be amended concluded with the following paragraph:

This petition raises fundamental issues as to the nature and future of this unified Bar, the resolution of which will necessarily influence, among other things, the course of the Bar's now-commencing budget, dues-setting and nominations processes for the fiscal year commencing July 1, 1981. Accordingly, pursuant to Rule XIII, Section 1, of the Rules Governing the Bar, we suggest that this Court schedule an early hearing as an aid to the prompt consideration and disposition of the petition.

We did stay the effectiveness of Referendum No. 2 pending further order. We invited comments, and received more than 150 written submissions. We also conducted two days of hearing in which we listened to scores of oral presentations. As would be expected, the opponents of Referendum No. 2 urged us not to amend Rule I. The proponents of Referendum No. 2 now take the position that the referendum is self-executing, and that no rule change is needed. Thus, no one urges that we should amend Rule I.[6]

### IV

The principal differences between the various parties are readily apparent. Their resolution, however, revolves around the nature of the court's role in this controversy. We are grateful to all who took the time to advise us of their views; without exception each such person expressed sincerely felt beliefs. Many devoted their attention to contending that the Bar's continuing legal education programs and its lawyer referral and information service are desirable. No one has disagreed with that proposition. Rather, the question is whether the membership permissibly may determine by majority vote that such activities not be supported by dues which must be paid by every lawyer who is admitted to practice in this jurisdiction.

---

**6.** However, as a fallback position, proponents of Referendum No. 2 have stated that if we conclude that a rule change is necessary, we should adopt the proposed rule which mirrors the referendum.

The principal document filed with us in opposition to Referendum No. 2 was signed by a former president of the Bar. It also bore the names of 37 other attorneys, including several other past presidents of the Bar and some past and present members of the Board of Governors.[7] In one paragraph of that pleading, a recognition of the problem was coupled with a plea for the rejection of the referendum:

Probably the Bar has made some errors in judgment, and the appropriateness of some isolated statements and activities is undoubtedly questionable. For any such errors, some of the participants in this Statement share responsibility. Nonetheless, we are convinced that it would be a serious mistake—indeed, a tragedy—if this Court were to change Rule I in accordance with the Referendum result, to thus turn the clock back, and thereby to emasculate what has evolved into one of the most respected unified bars in the country.

In another written submission, a present member of the Board of Governors explained his view of the passage of Referendum No. 2 in the following manner:

Many supporters of Referendum Number 2 are laboring under an outdated view of the Unified Bar and its structure, having misread and misinterpreted its evolution over time. In the formative years of the Bar, the Board of Governors took a number of actions which, in my view, a compulsory organization should not have taken. Unfortunately, the Bar still has not erased from the minds of its members the memory of those actions, including the decisions of the Board of Governors to take positions on legislative proposals and to file *amicus curiae* briefs, purporting to speak for the entire Bar. Indeed, I believe many members of the Bar voted for Referendum Number 2 to limit permissible Bar activities precisely because of the misconception that the Board of Governors still engages in such activities.

Similarly, in the early years of the Bar, compulsory Bar dues were spent directly to fund some *pro bono* or public interest activities of various kinds. Many members of the Bar think that their dues monies still are used to support such activities today, another misconception.[8] Some Bar members also believe that the Board of Governors is a monolithic group of public interest spendthrifts with a fixed philosophical bent. That is not so, if it ever was. Indeed, this entire perspective on the Bar's philosophy, policies and activities is not only outdated and in error; it unfairly disregards the honest, successful attempts that have been made to alleviate the misjudgments of the Bar's infant years.

■■■ It was mentioned earlier that the critical question is the nature of our role. We have no doubt but that had the referenda been defeated, and had the hypothetical losers sought to have us override the referenda and curtail the use of dues revenues, we would be hearing vigorous arguments from the Board of Governors' side to the effect that the results of the referenda must be controlling. After all, § 4 of Rule VII is not ambiguous. It provides in pertinent part that: "The results of a referendum . . . shall control the action of the Bar, the Board of Governors, the officers and the committees." Had the referenda been defeated, such an argument on behalf of the opponents of the referenda would have been undeniably persuasive. Here, where the proponents of the referenda prevailed,

7. The Board of Governors quite properly took no official position as to the possible amendment of Rule I.

8. We note that if that statement is correct, the concern expressed by the opponents of Referendum No. 2 has been overstated. However, it appears to be inaccurate. For the fiscal year ended June 30, 1980, the Bar reflected the expenditure of $251,457 for "Public service activity." On the income side, the only matching item which is apparent is $30,986 from the Lawyer Referral and Information Service. In his statement which follows (*post*, at 535–536), Judge FERREN states that the "coordinated programs of the Office of Public Service Activities require money—$385,000 in 1980–81, of which $360,000 or $11.22 per lawyer are budgeted from Bar dues." (Footnote omitted.) We see no reason to doubt his figures.

the same argument may not be deemed any less controlling.

This is not to say that the referendum power is unlimited. We all should be able to agree that a referendum may not impinge upon the constitutional rights of the members of our Bar, nor may a referendum effect a per se amendment of our Rules Governing the Bar. Here, no one has suggested that the referenda conflict with attorneys' constitutional rights. To the contrary, many have argued that the Board of Governors' use of mandatory dues for certain purposes henceforth precluded by Referendum No. 2 has violated their rights.[9]

We are left with the task of determining whether Referendum No. 2 impermissibly effects an amendment of our Rules. In making this judgment, two of our Rules must be considered. The first is § 2 of Rule I, which sets forth the general "Purposes" of the Bar. Our colleague Judge MACK, in her separate opinion (*post*), takes the position that Referendum No. 2 impermissibly contravenes § 2 of Rule I and hence that we should prevent its implementation. We have quoted from two of the pleadings filed by opponents of Referendum No. 2; we quote now from the submission made by one member of the Bar (who, incidentally, is a former state supreme court judge):

> It is clear that the general purposes of the Bar as stated in the rules of the Court of Appeals creating the Bar are expansive and inclusive. This is not only good draftsmanship but is common in the drafting of similar documents of both government and private organizations. This certainly does not imply that every conceivable activity which would not be ultra vires under the statement of purposes must be undertaken by the organization. If that were so, there would scarcely be a solvent public or private corporation or agency in the country. Indeed, the officers and Board of Governors of the D.C. Bar have themselves demonstrated that they do not thus construe the

statement of purposes. One of the purposes of the Bar is stated to be "to encourage the formation and activities of volunteer bar associations." If the compulsory bar has done anything to encourage the voluntary bar it has not been apparent to one, like myself, who is merely a member of both.

Furthermore, a number of the purposes are obviously of such breadth that they cannot be fully undertaken with any reasonable expenditure of funds and effort. Among the purposes is to provide a forum for the discussion of subjects pertaining to the practice of law. For this to be construed as mandatory and to extend to the limits of its terms would require the Bar to maintain the equivalent of a full university law school course. This is obviously not the intention of that provision. A similar analysis is applicable to nearly every part of the statement of purposes.

We agree that there is nothing mandatory in § 2 of Rule I. That is, it does not obligate the Bar to perform any of the functions which have proven to be so controversial. It thus presents no impediment to the implementation of Referendum No. 2.

We reach a somewhat different conclusion with respect to § 3 of Rule IV, which is quoted on pp. 523–524, *supra*. If Referendum No. 2 were to be construed literally, it might be viewed as preventing the performance of some of the basic functions of the Bar. For example, the propriety of holding an annual meeting could be cast in doubt and communications with the membership might cease—including even preventing the holding of a future referendum. When we set forth the "Functions" of the Board of Governors in § 3 of Rule IV, we authorized by rule the taking of specific steps necessary to permit the day-to-day functioning of the organization. Hence, while Referendum No. 2 is entitled to be implemented, that result is to occur only to the extent

---

**9.** This is without regard to the due process rights of the proponents of Referendum No. 2 which might be violated if we were to refuse to follow our own rules as to the implementation of a properly conducted referendum.

that it does not deprive the Board of Governors of its ability to perform the operational functions specifically set forth in § 3 of Rule IV.

V

It is difficult to avoid the feeling that those of our colleagues who would preclude the implementation of Referendum No. 2 essentially are reflecting how they would have preferred the referendum to have been resolved. We perceive it as beyond question that the democratic rights which we have established for our Bar's membership by adopting referendum procedures would be scant rights indeed if we were to say that the result of a referendum "shall control the action of the Bar" (Rule VII, § 4) only when a majority of the members of this court agrees with the result. Moreover, we neither can nor should function as a continuing arbiter over internal disputes as to day-to-day Bar policies. The heavy demands upon our time to meet our adjudicatory responsibilities already make extremely arduous the achievement of our dual goals of deciding appeals as correctly as we can, as promptly as we can.

We choose not to deal with various specific aspects of Judge FERREN's separate statement. As to its obvious social and philosophical overtones, we note that The Washington Post published an editorial on the subject on April 4, 1981. To convey that publication's views as to the problem before us, the editorial is reproduced as Appendix B hereto. We quote at this point its last two paragraphs:

> But the fight over using the D.C. bar's dues for public service is essentially a battle to institutionalize the idea of community service and make it a requirement

for all lawyers working in Washington. The D.C. bar is not a voluntary organization; a lawyer must be a member to practice law here. To compel any person to do the bar's bidding on a matter of social policy, not professional ethics, is wrong in principle.

It is important to note that the vote on dues in no way represented a limit on what activities some members may want to support voluntarily. Some lawyers and law firms will want to help the bar maintain some, if not all, of the current activities. It is also likely that, as individual lawyers and law firms direct their money to particular activities, the bar will become a better reflection of the will of its members. But even if the bar's members choose to do nothing, the Appeals Court should not require a lawyer to do anything other than not cheat his clients and abide by the law in order to qualify to practice in the city's courts.

We do, however, refer to a small portion of Judge FERREN's statement as the basis for concluding this opinion. On p. 535, *post*, he notes examples of how the nation's largest voluntary bar association—the American Bar Association—has funded certain projects to assist in supplying legal services.[10] He then states:

> Referendum No. 2 puts the Bar's programs in jeopardy. Do the lawyers of the community have authority to cut off dues support for them?

In considering that question, it must be understood that the referendum in no sense precludes such programs as continuing legal education or a lawyer referral and information service; it simply establishes that they are not to be funded by mandatory dues.[11]

10. This very fact (with respect to which Judge FERREN is quite knowledgeable through his services as Chairman of the ABA's consortium on Legal Services and the Public) is a further demonstration of the concept that meaningful voluntary efforts will be made to meet legiti-

mate needs for legal services, both by voluntary bar associations and by volunteers within the framework of a mandatory bar.

11. The facts concerning continuing legal education are instructive. For the fiscal year ended

As a practical matter, the subject programs were not put in effect by direction of this court; they were created by the Bar solely through the wishes of its successive Boards of Governors. Now, through the referendum process, the membership permissibly has overridden the Board as to the future utilization of mandatory dues revenues. If the question were phrased: "Do the lawyers of the community have authority to alter Bar policy consistent with the relevant statute and our Rules?", the answer could only be "yes."

The implementation of Referendum No. 2 will not adversely affect the proper functioning of the Bar. To the contrary, we are hopeful that it will go a long way towards healing the counterproductive divisiveness within the Bar of which we have been aware. Moreover, the President-elect of the Bar (who also is and has been a member of the Board of Governors, although the manner in which the Bar's nominating machinery has been operated—itself a source of considerable dissatisfaction—made it necessary for him to become a candidate by the petition process) has made clear his belief that the Bar not only can but will function well within the limitations of Referendum No. 2.

Additionally, Referendum No. 2 is not the end of the decisional process within the Bar; it is but another prologue. Lawyers who have been on each side of the Referendum No. 2 issue should cooperate meaningfully to resolve future problems as they arise. Inevitably, of course, they will arise. Our disposition of the present controversy leaves essentially unresolved, for example, the problem of the *District Lawyer*. Obviously many like it in its present magazine format; equally obviously many others consider it a needless extravagance and the purveyor of a particular type of Bar philosophy. Section 3 of our Rule IV, against which the implementation of Referendum No. 2 must be measured, authorizes the Board of Governors in part "to arrange for publication of an official Bar bulletin or journal." We do not view it as our role now to determine whether the *District Lawyer* falls within that definition. If a satisfactory middle ground cannot be found as to a form of publication which is acceptable to a majority of the Bar's membership, perhaps further resort to the referendum process will become necessary—on the initiative either of the Board of Governors or of the requisite number of non-Board members. The same may be true of other issues.

Finally, we are unanimous in not sanctioning the implementation of Referendum No. 2 until July 1, 1981, the beginning of the Bar's next fiscal year. This time period should be more than adequate for a smooth transition to the modified course charted by Referendum No. 2. All agree that this community possesses an enormous pool of skilled and dedicated attorneys. As we proceed from this milestone, we urge each of them to strive for conciliation, cooperation, and effective performance within the framework of a cohesive and properly channeled unified bar.

June 30, 1980, the Bar's continuing legal education expenses were $245,437; the income therefrom was $219,444. It is our understanding that a majority of the panelists used by the Bar in such programs has been paid in excess of $100 each. (I know of no voluntary bar associations which pay their participants; peer recognition and a desire to be of assistance to others have proven to provide sufficient incentives to permit voluntary bars' continuing legal education programs to succeed.) Only a relatively slight increase in CLE revenues and/or a reduction in CLE expenses would make the programs self-sustaining, which is all that is required by Referendum No. 2.

## APPENDIX A

### ORGANIZATIONAL CHART-THE DISTRICT OF COLUMBIA BAR *¹ (UNIFIED)

## APPENDIX B

### THE WASHINGTON POST

[April 4, 1981, p. A 12]

### LAWYER'S ROLE

THE DEBATE has resumed over the proper role of the D.C. Bar. On one side are lawyers who say the bar should simply serve its stated function of registering and disciplining lawyers who practice in the District. On the other side are lawyers who say that the bar is required by the ideals of the profession to involve itself in city life, and that part of the bar's dues should pro-

vide social services, such as lawyer referral and studies of the court system.

In December, the bar's membership voted to confine the use of its dues to discipline and registration only. But now the D.C. Court of Appeals, which oversees the bar, is set to make a final decision on the question.

At issue here is the role of lawyers in society, not just the role of the bar. Part of the argument in favor of using dues for social services is that good lawyers as individuals should contribute to the betterment of the city, in the tradition of some socially concerned lawyers who offer their services pro bono to the poor. This tradition is a fine one. Some bar associations with voluntary membership have even decided to expand on those individual acts by making service to the community a formal part of their mission.

But the fight over using the D.C. bar's dues for public service is essentially a battle to institutionalize the idea of community service and make it a requirement for all lawyers working in Washington. The D.C. bar is not a voluntary organization; a lawyer must be a member to practice law here. To compel any person to do the bar's bidding on a matter of social policy, not professional ethics, is wrong in principle.

It is important to note that the vote on dues in no way represented a limit on what activities some members may want to support voluntarily. Some lawyers and law firms will want to help the bar maintain some, if not all, of the current activities. It is also likely that, as individual lawyers and law firms direct their money to particular activities, the bar will become a better reflection of the will of its members. But even if the bar's members choose to do nothing, the Appeals Court should not require a lawyer to do anything other than not cheat his clients and abide by the law in order to qualify to practice in the city's courts.

Separate Statement of KERN, Associate Judge:

The essence of the various arguments presented in this proceeding to this court to overturn the referendum is that existing Bar functions, principally a Lawyers Referral Service and Continuing Legal Education, can no longer be effectively administered in this jurisdiction unless they continue to be financed by the annual compulsory dues paid by members of the D.C. Bar. I reject this notion. Other distinguished bars, e. g., the Bar of the City of New York (long regarded as a model bar group), administer these activities on a voluntary basis, not on a government-compelled basis. I cannot believe the membership of the Bar of this city lacks the will and the way that its counterpart in New York possesses.

Underlying all the separate statements on this court that oppose the referendum going into effect as provided by our Rules is the notion that unless the State (this court) compels it, the obligations of the profession will not be met. I reject this pessimistic notion, which surely demeans our Bar. There have been for decades in this city and there will be in the future an effective Lawyer Referral Service and Continuing Legal Education. Any view to the contrary is based on ignorance of the past and despair for the future.

Some members of the community appear to hold the notion that those in need of legal representation or those who seek improvements in the system of justice are being abandoned as a result of the bar referendum. They should recognize that the funds accumulated from mandatory Bar dues can neither hire lawyers for the needy nor create ideas for law reform. Instead, reliance must be had, as always, on lawyers—and especially law firms because of their personnel resources. They, not dues money, can best provide legal representation by continuing to make themselves available for service on the Lawyer Referral List and provide direction to legal reform by their participation in it.

The incoming President of the Bar and other prominent Bar members have accepted the referendum and called for a beginning based upon the concept of voluntary service that has been traditional with the

legal profession. I am confident that all lawyers will now put aside the divisiveness that has wracked the Bar in recent years and come together: to plan and work for the common ideals of serving the profession and the community. As the inscription on the Western Plaza in front of City Hall reminds us: Washington was planned as a city of ideals.

Separate Statement of NEWMAN, Chief Judge, dissenting:

I find it shameful that the District of Columbia Bar is to be permitted to shirk its responsibility to provide an institutional mechanism for the members of the legal profession in this jurisdiction to fulfill their ethical obligations mandated by the Code of Professional Responsibility merely because a majority of those voting in a referendum chose this path. We have the authority to prevent such a default. We should exercise it.*

Separate Statement of MACK, Associate Judge, dissenting:

I would deny the petition of the District of Columbia Bar to amend Rule I. I would do so because I believe its provisions accurately reflect the mandate of the Code of Professional Responsibility that lawyers, as guardians of the law, have affirmative duties in maintaining the integrity and competence of the profession and in serving the public, including that of making legal counsel available. *See* Canons 1, 2, 6, and 8.

For the above reasons, I take issue with the five members of this court, including one "dissenting" member,[1] who have voted to lift the stay holding in abeyance the operation of the referendum result. I would continue in effect, and make permanent, our order staying the effectiveness of what I view as a referendum "ultra vires" of our court rules. In my view, this controversy does not lend itself to arguments of "democracy" or "violation of rights". The practice of law is a privilege. Granted that under our court Rule VII § 4, the results of a referendum control the action of the Bar, the rule presupposes that the result (or the referendum seeking that result) is one which is the subject of proper action under our court rules in the first instance. I see the sweeping referendum at issue here as one on a collision course with our court rules which authorize the Bar to spend funds for expenses incurred in carrying out the purposes of the Bar. *See* Rule I §§ 1, 2, Rule II § 4, Rule VII and, of course, Rule IV § 3 (as conceded by Judge Harris). In the absence of such rule changes, I believe the Bar would have been justified in declining to put the issue on the ballot in the first instance.

Statement of FERREN, Associate Judge, dissenting: *

Since April 1972, a rule of this court has required the lawyers of our community to join and pay dues to the District of Columbia Bar. We share this regulatory system, known as a "unified" bar, with 31 states. Several months ago, in Referendum No. 2, the members of the Bar voted to limit their dues support to four functions: admission, registration, and discipline of attorneys, and

---

* Since there is not a majority of the court prepared to exercise this authority, I have voted to vacate the stay previously entered.

1. In the posture of this case, and most certainly in view of the countless number of dedicated lawyers who have turned to this court for guidance, I find it difficult to see the issue as one of whether the Bar is "be[ing] permitted to shirk its responsibility" as a result of a referendum. The Bar's responsibility is either mandated by our rules or it is not. If this court has the authority to prevent a "default" of the Bar's responsibility, either under its rules or otherwise, and this court decides to exercise that authority or declines to exercise it, it is the court's decision which is "shameful" or "[not] shameful", depending upon one's point of view. With respect to a court which is equally divided as to the merits of the referendum, a vote to vacate the stay decides the issue, whatever it may be.

* The statements in response to the court's order were issued on May 5, 1981 in typewritten form, in order to expedite notice of the court's decision. The following statement has been amended in a few respects since the date of issuance.

maintenance of a client security fund.[1] They elected to cut loose all other programs unless the Bar can attract voluntary contributions to save them. Today, this court—I believe unwisely—sustains the Referendum.

I have four concerns. First, to put the matter in perspective, this court's decision could result in a significant reduction of Bar activities, to the detriment of the community. Second, the court does not have to implement the Referendum; under our rules it is not self-executing. Third, the Referendum, in legal effect, is a petition for a change in court rules governing the unified Bar. In my judgment, we should stay its implementation pending the appointment and report of a task force created to review all unified and voluntary bar programs, to identify those which are essential to the bar and to the public, and to recommend an overall bar polity for the District of Columbia, in order to assure that all essential functions will continue, with appropriate financial support. Finally, national developments make the consequences of what we do all the more severe. The court's action is especially unfortunate because it jeopardizes the Bar's ability to recruit, train, and refer volunteer lawyers for the indigent at the very time the federal government is threatening to terminate the Legal Services Corporation, which finances legal services to the poor—including

$1,856,021 this year for our local Neighborhood Legal Services Program. We face abdication by both the public and the Bar of their joint responsibility to assure access to justice for all persons.

I turn to each of these concerns.

I.

As a practical matter, Referendum No. 2 leaves to the Bar's Board of Governors only one operation supported by dues: the mechanical process of updating lawyer registration. Other groups presently administer the three other Referendum-approved functions. This court, assisted by its own Committee on Admissions, handles the admission of attorneys; court-appointed Trustees operate the Client Security Trust Fund; and a court-appointed Board on Professional Responsibility governs the disciplinary system.[2]

Almost precipitously, therefore, funding no longer is assured for virtually the entire program of professional and community activities overseen by the Board of Governors. These include continuing legal education (CLE) to help maintain lawyer competence; an array of 17 membership divisions and 11 standing committees (as well as special committees) to study and recommend improvements in the administration of justice; an Office of Public Service Activities to provide lawyer referral and information services, including help for the indigent; a

---

1. Referendum No. 2, passed on December 18, 1980, provided in full:

    Mandatory dues and assessments of the District of Columbia Bar shall be used only for the following purposes: admission of attorneys; their continued registration; discipline of attorneys; and, client security fund. Any other activities shall be funded by other means, including but not necessarily limited to, voluntary contributions. If in the judgment of the Board of Governors, implementation of the foregoing requires a rules change, the Board is directed to petition the District of Columbia Court of Appeals to obtain such change.

    In September 1980, the Bar's Board of Governors had decided that if Referendum No. 2 passed, implementation would require a change in Bar rules. Accordingly, on December 24, 1980, the Board of Governors petitioned this

court to add to Rule I a new section incorporating the provisions of the Referendum. In response, this court stayed the effect of the Referendum pending further order of the court.

Also on December 18, 1980, in Bar Referendum No. 1, the membership voted to impose an annual dues ceiling of $75—a vote precipitated by the Board of Governors' petition requesting this court to raise the dues ceiling to $150. Bar dues currently are $65 per year.

2. The Board of Governors nominates to this court candidates for the Board on Professional Responsibility, see Rule XI, § 4(1), and approves the BPR budget, see id § 4(3) (j). The Board of Governors oversees the operations of the Client Security Trust Fund and provides administrative and direct financial support. See Rule XII, §§ 6–10, 12.

major Bar publication, the *District Lawyer*, to report on local professional issues and on significant national trends; and a Citizens Advisory Committee to help assure lawyer accountability by putting hard questions from the client perspective.

It is true that all these programs can continue at current levels if all members of the Bar voluntarily contribute what they otherwise would be required to pay in dues (presently $65 per year). But, absent such assurance, we must confront the possibility of a substantially reduced Bar program, including cutbacks if not elimination of traditional bar functions. It is difficult to imagine, for example, an effective organized bar without membership divisions and study committees. Over the years, the courts, the profession, and the community have benefited enormously from the unified Bar's study of justice-related issues. For example, Division 2 (Antitrust, Trade Regulation and Consumer Affairs) issued a major report on consumer protection; Division 5 (Criminal Law and Individual Rights) scrutinized Superior Court appropriations; and Division 4 (Courts, Lawyers, Administration of Justice) has contributed a number of important evaluations on the unauthorized practice of law, six- and twelve-member juries, District Court rules, reciprocal admission to federal courts, fee arbitration, and lawyer competency requirements for the federal courts.

Bar committees have provided equally significant service. Recently, the Horsky Committee completed a comprehensive study of the local court system, released in ten volumes over a two-year period. In earlier years, committees have issued special reports on criminal defense services, complaints about ineffective assistance of counsel, the proposed transfer of prosecutive and judicial-appointive powers from the federal to the District of Columbia government, and the prospects for arbitration in conjunction with Superior Court proceedings. Important standing committees, such as the Committee on Legal Ethics, have made similar contributions.

The diversity of the Bar adds significant strength to the work of its divisions and committees. Recently, for example, this court received a comprehensive report on a matter of substantial professional and public concern from a Bar committee comprised of 19 lawyers engaged in a wide variety of fields. There were 4 lawyers from large firms, 3 from medium firms, 4 from small firms, 5 sole practitioners, 1 from a prepaid legal service plan, 1 law professor, and 1 federal administrative law judge. The makeup of this committee enhanced the quality and credibility of the report; such diversity reflects a special contribution that a unified bar assuredly can make.

There is another threatened program, the Office of Public Service Activities, which is of particular significance to the public. Through its Lawyer Referral and Information Service (LRIS) and related programs, this Office has been handling approximately 20,000 calls a year from persons in need of information or a lawyer's help. Last year, trained Bar staff, after carefully screening each matter, were able to assist 43% of the callers without need for referral. Of the others, the staff directed 18% to lawyers on a regular or reduced fee basis and referred the other 39%—unable to afford a fee—to legal aid organizations, *pro bono* lawyers, government agencies, community programs, and the courts. In addition, LRIS maintains a branch at the Landlord-Tenant Division of Superior Court, providing conciliation as well as referral service.

The Bar's ability to provide such comprehensive assistance has depended, in substantial measure, on full-time staff equipped not only to relay information about community resources, but also to recruit *pro bono* lawyers, to sponsor training for these lawyers in fields (such as Landlord-Tenant court) which do not easily generate paid CLE subscribers, and to match indigent clients with volunteer lawyers having particular interests and skills. These coordinated programs of the Office of Public Service Activities require money—$385,000 in 1980–81, of which $360,000 or $11.22 per

lawyer are budgeted from Bar dues.[3] In contrast with the outlook for certain other Bar programs, the prospect is dim for increased user charges to sustain this essentially *pro bono* service.

There is irony here. Last year, because of the Office of Public Service Activities, the D.C. Bar received the American Bar Association's annual Harrison Tweed Award for excellence, and the ABA selected LRIS as the model for an ABA-funded demonstration project in Louisville, Kentucky. This year, the ABA has created a *Pro Bono* Activation Project, funding *pro bono* coordinators around the country by reference to the pioneering approach of the D.C. Bar.

Referendum No. 2 puts the Bar's programs in jeopardy. Do the lawyers of our community have authority to cut off dues support for them?

## II.

This court confronts a narrower legal question than the constitutionality of a unified bar, which the Supreme Court in principle has upheld. *See Lathrop v. Donohue,* 367 U.S. 820, 843, 81 S.Ct. 1826, 1838, 6 L.Ed.2d 1191 (1961). We are asked, rather, to determine whether the rules of this court governing the District of Columbia Bar permit lawyers, by referendum, to cut off dues support for certain unified Bar activities. I conclude that the answer here must be "no," for at least some of the programs affected by the Referendum are inherent Bar responsibilities; dues support cannot be eliminated unless this court changes the rules governing the Bar. Under the circumstances, therefore, the Referendum is not self-executing; it amounts to a petition

for a rules change, subject to court approval.

A. This court has the responsibility to regulate the legal profession in this jurisdiction. Our authority is reflected in D.C. Code 1973, § 11–2501(a), which provides:

> The District of Columbia Court of Appeals shall make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion.

In the words of the Preamble to our rules for the Bar we have adopted Rules I through XIV (including the lawyers' Code of Professional Responsibility in Rule X) in furtherance of this "statutory authority governing admissions to the Bar."[4]

Referendum No. 2 has revealed ambiguities in these rules. On the one hand, the purposes of the Bar are broad. Rule I, § 2 provides:

> The purposes of the Bar shall be to aid the court in carrying on and improving the administration of justice; to foster and maintain on the part of those engaged in the practice of law high ideals of integrity, learning, competence in public service, and high standards of conduct; to safeguard the proper professional interest of the members of the Bar; to encourage the formation and activities of volunteer bar associations; to provide a forum for the discussion of subjects pertaining to the practice of law, the science of jurisprudence and law reform, and the relations of the Bar to the public, and to publish information relating thereto; to carry on a continuing program of legal research and education in the technical fields of substantive law, practice and

---

3. Financial information supplied by the Bar at the court's request shows the following allocations of the $11.22 in 1980–81:

| | |
|---|---|
| Information and Referral Service | $ 6.20 |
| Recruitment of *Pro Bono* Lawyers | 2.21 |
| CLE for *Pro Bono* Lawyers | 1.09 |
| General Administration | .63 |
| Response *to* Court and Public Requests | 1.09 |
| | $11.22 |

4. Even without the statute, we have acknowledged in the same Preamble that this court has "inherent powers over members of the legal

profession," an authority characteristically exercised by the highest court of every state. *See, e. g., Laughlin v. Clephane,* 77 F.Supp. 103, 105 (D.D.C.1947); *Clark v. Austin,* 340 Mo. 467, 474, 101 S.W.2d 977, 980 (1937) (en banc); *In re Integration of Nebraska State Bar Ass'n,* 133 Neb. 283, 286–89, 275 N.W. 265, 266–68 (1937); *In re Unification of New Hampshire Bar,* 109 N.H. 260, 263, 248 A.2d 709, 712 (1968); *State ex rel. Armstrong v. Board of Governors,* 86 Wis.2d 746, 750, 273 N.W.2d 356, 358 (1979) (per curiam).

procedure, and make reports and recommendations thereon; to the end that the public responsibility of the legal profession may be more effectively discharged.[5] Both supporters and opponents of the Referendum agree that these purposes encompass (and thus justify) virtually all the activities created and supervised by the Board of Governors.[6]

On the other hand, the rules allow the membership substantial control over Bar policy through referenda. Rule VII, §§ 3 and 4 provide:

▌ The Board of Governors shall, in like manner, submit for determination by the members of the Bar, any question of Bar policy, including proposals for changes in the rules or By-laws, whenever directed so to do by a petition signed by not less than three hundred active members of the Bar.

▌ Ballots for use in any such referendum shall be prepared, distributed, returned and counted in accordance with regulations prescribed by the Board of Governors. The result of a referendum, as determined by a majority of the votes cast, when duly ascertained shall be published by the Board of Governors in the official Bar bulletin, and shall control the action of the Bar, the Board of Governors, the officers and committees.

Supporters of the Referendum argue with considerable force that under these provisions the members' authority is literally coextensive with the authority of the Board of Governors; that a "determination" of "Bar policy" by referendum is clearly self-executing because it "shall control the action of the Bar"; and that the Referendum, accordingly, deserves immediate implementation as a matter of court rule, not judicial discretion. Supporters rhetorically ask, "Who, after all, could question the right of the Board of Governors—if it chose to do so—to close down CLE, LRIS, and the *District Lawyer*, which the Board created as a matter of its own discretion?" They answer that the Board, and thus the members, have that right.

Opponents of the Referendum answer the question differently. They argue that Rule I, § 2 mandates most if not all the current Bar activities; if the Board had not created them, this court would have had to nudge the Bar to do so. By calling for "sweeping changes" which would "transform the very nature of the D.C. Bar," the Referendum, they say, in effect would amend Rule I—an act requiring court approval, not merely a lawyer plebescite. *See* Rules VII, § 3; XIII, § 1.[7] Focusing then on the merits, the opponents emphasize this court's responsibility to the public, as well as to the lawyers, and call on us to dismiss the petition and enjoin the Referendum, in order to assure that essential programs continue.

The arguments on both sides of the Referendum have force, enough to reveal a gaping hole in our rules governing the Bar. Literally, Rule VII on "Referendum Procedure" gives the members plenary authority over "Bar policy," *except* that members can make only "proposals" for changes in the rules of this court. Rule VII, § 3; *see* Rule XIII, § 1. What, then, amounts to a rules change, which the members cannot unilaterally accomplish?

The question is especially difficult when directed to Rule I, § 2, for that provision expresses purposes without making clear which ones are mandatory and permissive,

---

5. The court modeled this comprehensive list of responsibilities on the rules governing the unified bar of Wisconsin. *See Lathrop, supra*, 367 U.S. at 828–29, 81 S.Ct. at 1830.

6. There is a dispute over the propriety of an instance of alleged lobbying by the Citizens Advisory Committee (on which I express no opinion). *See Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 235–36, 97 S.Ct. 1782, 1799–1800, 52 L.Ed.2d 261 (1977); *Lathrop, supra*, 367 U.S. at 847–48, 81 S.Ct. at 1840.

7. Rule XIII, § 1 on Amendment of Rules provides:

Proposals for amendment of these rules may be presented to the court by (a) petition of the Board of Governors; or (b) petition of the assembly [of members] in respect of changes approved by referendum as provided in Rule VII. Hearing upon such a petition will be pursuant to notice in such manner as the court may direct.

respectively. Withdrawal of dues from a Bar program necessary to accomplish a mandatory purpose presumably would require an amendment of Rule I, § 2; other program changes would not. Thus, unless all Bar programs can be deemed mandatory (which surely they are not), the Referendum cannot be held automatically to violate Rule I, § 2.

On the other hand, the unification of the Bar would have little meaning if all its purposes and programs were discretionary. Even if the court's primary motivation in creating the Bar was to improve lawyer discipline, the fact is the court chose not to establish merely a disciplinary system. It could have taken that narrower approach, as 17 of the 19 states without unified bars have done;[8] but the court instead launched—and for nine years has overseen—a unified Bar, the predominant regulatory mechanism in this country for assuring that the lawyers of a community carry out *all* their professional responsibilities to the public, not just their obligation to weed out ethics offenders. Indeed, were it not for the lawyers' public responsibilities, there would not be a need for a unified Bar; lawyers could be expected to look out for their own self-interest through voluntary associations.

In making its unification decision, this court had to be aware of the comprehensive nature of unified bar programs in the various states. Moreover, the court evidently was saying that voluntary bar associations alone could not be expected to shoulder the profession's entire institutional responsibility. In short, in creating the unified Bar

and clothing it with the many purposes of Rule I, § 2, this court, it would appear, was counting on the Bar to undertake certain functions, not merely inviting it to do so.

Because the court did not make clear what the essential functions are, we confront a difficult question: can a referendum-ordered change of program so distort or retrench the Bar that the decision is not merely a matter of "Bar policy" but becomes *in effect* a "rules change"—an amendment of Rule I—requiring court approval?[9] If (as must be true) a membership referendum may accomplish considerably more than a change in quorum requirements but something less than de facto abolition of the unified Bar itself, where is the line to be drawn? We have not said, in the rules or elsewhere.[10]

B. In trying to draw this line myself while considering the Referendum, I recalled one speaker at the hearing who offered a particularly useful insight. He pointed out that the Board of Governors or the membership could so cripple the Bar through dismantling of functions, in derogation of Rule I, § 2, that the functions remaining would not "cohere"; in other words, there would not be a critical mass of activities left to produce a rational, publicly responsible pattern of bar regulation. In such circumstances, he said, whether the Board or the members are responsible, the court should step in and stop it. Despite the case-by-case decisionmaking required, I find this approach persuasive, for the only alternative is an open-ended, and thus improper, delegation of this court's regulatory

---

8. *See* American Bar Association, Directory of Bar Activities 20–23 (1980).

9. Proponents of the Referendum recognized the significance of this question, for the last sentence of Referendum No. 2 specifically directed the Board of Governors, if necessary, to petition for a rules change. The Board of Governors perceived the Referendum as a vote favoring a rules change and accordingly petitioned this court for an amendment to Rule I. *See* note 1 *supra*.

10. Rule IV, § 3 does not draw the line. This rule, which I see as instrumental, not substan-

tive, provides that the Board of Governors "shall have general charge of the affairs and activities of the Bar," and then specifically empowers the Board to conduct the annual membership meeting, appropriate and disburse funds, prescribe employees' duties and salaries, take action on committee reports and recommendations, arrange for an official Bar publication, investigate matters affecting the Bar, make interim appointments to fill Board and officer vacancies, and adopt By-laws and regulations.

responsibility to a vote of the lawyers themselves.[11]

There is, however, an additional dimension we must take into account. Although this court created a unified Bar to assure that all lawyers share in the profession's collective responsibility, the court also recognized that both the profession and the public were likely to benefit if the Bar "encourage[d] the formation and activities of volunteer bar associations." Rule I, § 2. It follows that a coherent bar program for the District of Columbia does not necessarily have to inhere 100% in the unified Bar. The question, really, is twofold: (1) what programs are essential to the organized bar overall, mandatory and voluntary, and (2) which of these programs must the unified Bar underwrite to assure the necessary level of effectiveness?

In turning to the first question, I believe it is useful to focus initially on Canon 6 of Bar Rule X, the Code of Professional Responsibility: "A Lawyer Should Represent a Client Competently." [12] To respond to extreme cases of incompetence (as well as impropriety), we have established a disciplinary system under Rule XI. Supporters of the Referendum agree that this structure is central to the Bar and may continue with dues support. However, they would construe the concept of "discipline" literally and thus ban dues funding for "preventive" techniques such as CLE programs and peer review systems. In my judgment, that is an irrational regulatory limitation, compromising the Code of Professional Responsibility and contravening an express purpose of the Bar: to provide "a continuing system of legal research and education." Rule I, § 2. A referendum requiring a dues pullout from CLE, therefore, is too broad, absent assurances that comprehensive, affordable CLE can be otherwise guaranteed.

Similarly, Canon 2 of the Code of Professional Responsibility provides: "A Lawyer Should Assist the Legal Profession in Fulfilling Its Duty to Make Legal Counsel Available." [13] It is extreme, even nonsensical, therefore, to forbid use of dues for LRIS, the only type of mechanism through which many lawyers are likely, or even able, to offer their services on a reduced- or no-fee basis to clients who cannot afford the usual charge.[14] As indicated earlier, bar associations throughout the country

---

11. In 1980, there were approximately 26,000 "active" members of the D.C. Bar. Of those who did not maintain an office in the District of Columbia, estimates indicate that approximately 4,000 lived outside our metropolitan area. *See* Report of the Committee on Civil Legal Services of the Judicial Conference of the District of Columbia 37 (May 15, 1980), *summarized in* Ferren, *Guidelines for Budgeting Pro Bono Legal Service*, 5 District Lawyer 28, 32 (Sept.—Oct. 1980).

12. Rule X adopts as "the standards governing the practice of law in the District of Columbia" the American Bar Association's Code of Professional Responsibility, as amended by the court. *See* District of Columbia Bar, Code of Professional Responsibility and Opinions of the D.C. Bar Legal Ethics Committee (1981).

13. The 1980 Judicial Conference of the District of Columbia adopted the following resolutions suggesting voluntary guidelines for compliance with Canon 2:

RESOLVED that every lawyer has a professional responsibility to budget a portion of his or her time for *pro bono* legal service without fee to persons financially unable to retain counsel; and

FURTHER RESOLVED that every lawyer should fulfill that responsibility each year, at a minimum, by (1) accepting one court appointment, or (2) providing 40 hours of *pro bono* legal service, or, when personal representation is not feasible, (3) contributing the lesser of $200 or 1% of earned income to a legal assistance organization which serves the community's economically disadvantaged, including *pro bono* referral and appointment offices sponsored by the bar and the courts.

*See generally* Christensen, *The Lawyer's Pro Bono Publico Responsibility*, 1981 Am.B. Foundation Research J. 1.

14. The "ethical considerations" of Rule X, Canon 2 place a special duty on the organized bar:

The rendition of free legal services to those unable to pay reasonable fees continues to be an obligation of each lawyer, but the efforts of individual lawyers are often not enough to meet the need. Thus it has been necessary for the profession to institute additional programs to provide legal services. Accordingly, legal aid offices, lawyer referral services, and other related programs have been developed, and others will be developed, by the profession. Every lawyer should support all

have established *pro bono* referral services, in the words of Rule I, § 2, "to aid the court in carrying on and improving the administration of justice . . . to the end that the public responsibility of the legal profession may be more effectively discharged." In my judgment, a coherent bar program requires an adequately funded LRIS linked with *pro bono* recruitment and training. *See* note 3 *supra.*

It would serve no useful purpose for me to try to sort out further what kinds of bar activities are essential, other than to add that traditional membership divisions and committees would appear to be inherent in any organized bar, addressed as they are to virtually all the purposes of Rule I, § 2. The point is that we must look at the language of Rule I, § 2, the long-standing organized bar tradition, and the Code of Professional Responsibility for guidance in defining essential functions. Most if not all the necessary programs on my own list, such as CLE and LRIS (including *pro bono* recruitment), are to me a matter of professional ethics. I recognize that others will have their own lists and may sincerely disagree with mine.

It is unfortunate, therefore, that our rules do not more clearly set forth the essential unified Bar activities. The rules should state them explicitly, in order to clarify for the Board and the members alike what is and is not a "rules change" requiring court approval. Until the rules are amended, however, this court must exercise its regulatory responsibility by deciding (in event of a challenge) whether a particular referendum—given its nature and impact—merely establishes "Bar policy," within the authority of the membership, or proposes a

"rules change," subject to court approval. Such decisions are akin to our traditional determination whether this court has jurisdiction over a particular appeal or petition for review. It is this court, therefore, advised but not controlled by the members, which must clarify the essential functions of the unified Bar.[15]

Because the Referendum puts in jeopardy CLE, LRIS, and the Bar divisions and committees, not to mention a number of other Bar functions which arguably are essential, I conclude that Referendum No. 2 is too broad to be called simply a matter of "Bar policy," self-executing under Rule VII. It is, as the Board of Governors properly characterized it, necessarily a proposal to amend Rule I, § 2, requiring court approval. What, then, should we do here? More specifically, as to the merits, what essential programs must the Bar continue to underwrite with membership dues, in order to assure the necessary level of effectiveness?

## III.

My colleagues who find the Referendum self-executing do not reach this question. In doing so, I want to stress, first, that this court should not ignore the Referendum. When a majority of the voting members of the Bar—in a large vote—registers this much dissatisfaction, a full-scale review of the Bar is in order.[16] Of especial significance, as I hear it, is a complaint by some of the voluntary bar associations that the D.C. Bar has not faithfully attended to its obligation "to encourage the formation and activities of volunteer bar associations." Rule I, § 2. I have no views on the merits of that complaint; I simply know it is there, spoken loudly.

proper efforts to meet this need for legal services. [EC 2–25.]
*See generally* Cheatham, *Availability of Legal Services: The Responsibility of the Individual Lawyer and of the Organized Bar,* 12 U.C.L.A. L.Rev. 438 (1965).

**15.** It is no answer to say, as some have, that D.C.Code 1973, § 11–2501(a) itself draws the line here by preserving inviolate from Board or membership repeal only functions directly literally to admission, registration, and discipline of attorneys. That begs the question. A coherent, responsible bar program—which this court

has authority and a duty to assure—may require more than these narrow functions, as we have recognized in adopting Rule I, § 2. *See Lathrop, supra* at 828–33.

**16.** A formal evaluation of the Bar by its tenth anniversary in 1982 is particularly appropriate because, unlike some other jurisdictions, this court did not initially establish the unified bar for a trial period. *See, e. g., Lathrop, supra* at 832–33, 81 S.Ct. at 1832; *In re Unified New Hampshire Bar,* 112 N.H. 204, 207, 291 A.2d 600, 602 (1972).

This court, therefore, cannot properly respond to the Referendum on its merits without evaluating whether the voluntary bar should have a larger, more specific role in the overall bar program. Thus, even though the Referendum (in my judgment) is not binding, it poses a significant question: inasmuch as one or more voluntary bar groups also sponsor CLE, lawyer referral programs, and various committees, would a more formal partnership between the unified Bar and the many voluntary bar associations, with a clearer division of labor, get the job done as well or better—with a lower mandatory dues requirement? In creating the unified Bar, this court could only speculate about the relationship to—and impact on—the voluntary bar associations. We now have a nine-year experience to help answer that question.

The Bar's 1980–81 budget is approximately $2.4 million, of which mandatory dues furnish approximately $2.0 million. Of this amount, approximately $1.1 million represent expenditures for programs which dues no longer will fund as a result of the Referendum. To act responsibly, we have to assume that this level of expenditure is justified until proved otherwise.[17] Accordingly, before resolving the Board's petition for a rules change reflecting the Referendum, I believe this court should decide, with the help of both unified and voluntary bars, what programs are essential to the public and to the profession. Next, we should determine whether the unified and voluntary bars cooperatively will provide these essential programs. Finally, we should satisfy ourselves that if the use of unified Bar dues is to be restricted (and the dues level correspondingly lowered), all essential programs will receive adequate financial support through a combination of voluntary add-ons to D.C. Bar bills, voluntary bar association dues, and increased user charges where practical.

Thus, while I assume there can be responsible, possibly even more productive alternatives to the present relationships among unified and voluntary bars, I believe it is irresponsible of this court to take definitive action without having explored the facts in a way that will give the court, the bar, and the community a better sense of what the alternatives are and what the consequences of any action we take will be.

Specifically, I believe this court should not vacate the stay order of January 19, 1981. We should continue to stay implementation of the Referendum until January 1982 and convene a commission or task force of representative leaders of the D.C. Bar, the various voluntary bar associations, and perhaps even the lay public to define the essential bar programs, review the various bar organizations in the District of Columbia, recommend an overall bar polity, and suggest appropriate rules amendments, as needed. This difficult situation demands an informed, thoughtful response for the sake of both the legal profession and the community at large.

IV.

A few comments now about the future. At the hearings, several supporters of the Referendum stressed their own perceived right to be free from coercion to join any bar organization, aside perhaps from a duty to help subsidize core functions such as lawyer discipline and client security. I respectfully disagree that the duty is this narrow. I am encouraged, however, by the affirmative statements of other Referendum supporters who prophesied that the community can count on lawyers voluntarily to carry out their public responsibilities. These obligations certainly include adequate financial support for lawyer referral and for continued, aggressive recruitment of *pro bono* volunteers. Just this one program will require voluntary contributions of at least

---

**17.** In response to a request from this court, the Bar on February 17, 1981, furnished detailed information about the activities of the Bar, their costs, and their funding sources. In answer to 73 follow-up questions by proponents of the Referendum, the Bar on April 16, 1981, provided a detailed response evaluating the anticipated impact of dues withdrawal on LRIS, CLE, publications, and divisions. These detailed responses present a bleak picture; they put a heavy burden on those who advocate a wholly voluntary alternative.

$360,000 based on the current budget for the Office of Public Service Activities. *See* note 3 *supra.* If attorneys follow the Canon 2 guidelines adopted by our 1980 Judicial Conference, *see* note 13 *supra,* I believe that program will receive the support it needs.

With this said, it is important to add that the public at large, not just the legal profession, must assume more and more responsibility for providing access to justice, civil as well as criminal. And yet, as I write this statement, the national Legal Services Corporation, which funds our excellent Neighborhood Legal Services Program (NLSP), is under seige. Although federally financed legal services have been serving the poor since 1965, they face today an unprecedented campaign for extinction on Capitol Hill. The message for the District of Columbia is ominous. Given NLSP's current caseload, if it were forced to close down completely, the bar would be obliged to find lawyers for 2,500 to 3,000 pending cases—lawyers without prospect for a fee.[18] The point is this: the public and the bar must engage in an equitable, productive partnership to assure essential legal services to persons who cannot afford them. Those who say only the public—or only the lawyers—should pay for these services are hopelessly unrealistic, if not disingenuous. What is happening, I fear, is an abdication by both groups, the government and the bar.

This default is particularly unfortunate because of the severity of the situation. It is difficult to conceive of enough lawyers in the District of Columbia to cover all the civil legal problems requiring some sort of assistance. For example, in 1979, 99% of all contested landlord-tenant proceedings, 85% of all contested domestic relations actions, and 26% of all the other contested civil matters in Superior Court (excluding small

claims) had at least one party appearing without a lawyer, more often than not because a fee was not affordable.[19] These statistics, moreover, do not begin to reflect the need for legal assistance in matters not involving court action.

Self-evidently, therefore, in addition to providing increased legal services to the poor and finding new ways (such as high quality prepaid plans) to reduce the costs of service to persons of moderate income, the community has a preeminent need to find alternative ways of resolving many disputes without lawyers and the courts. Surely there are laws which could be simplified to permit self-help or lay assistance. Undoubtedly, lawyers now monopolize legal transactions that trained lay persons could handle. Clearly, too, there are disputes, now centered in the courts, which can be resolved as well if not better—and surely more quickly—through less formal settings and procedures such as mediation and arbitration.

Such enticing possibilities—law simplification, lay assistance, and alternatives to the courts—pose the very kinds of issues that the organized bar should be dealing with regularly, indeed tirelessly. Because of its ability to draw on a large, diverse membership of talented and committed professionals, the D.C. Bar has done so splendidly over the years. The community will bear the loss if the Bar cannot attract the financial resources to continue such service.

Given this court's ruling that Bar Referendum No. 2 shall become effective July 1, 1981, there is a challenging opportunity for all lawyers to show their good faith by keeping the organized bar vital—and the public served—as a matter of their voluntary professional responsibility. I look forward to that effort. We all must trust in it.

---

18. A specific, local example illustrates the burden placed on attorneys even now. In the child abuse and neglect area, the law entitles all "financially unable" parents, guardians, or custodians to appointment of counsel for "all critical stages of the proceedings." D.C. Code 1978 Supp., § 16–2304(b)(1); *see* Super.Ct. Neglect R. 20. Because no public funds are available to subsidize such representation, the full brunt of this requirement falls on volunteer lawyers—a disproportionate imposition considering that the right to counsel is a statutory entitlement.

19. *See* Report of the Committee on Civil Legal Services of the Judicial Conference of the District of Columbia, *supra* note 11, at 37, *summarized in* Ferren, *supra* note 11, at 28.

Statement of PRYOR, Associate Judge, dissenting:

The results of the referendum carry a practical message to the Bar leadership. This procedure is contemplated by the Rules. However, the same Rules establish the broad purposes of this mandatory organization of lawyers. With due deference to the voice of the membership, it seems clear that the referendum cannot supersede the stated purposes of the Bar. Accordingly, the Bar, by referendum, cannot limit itself to utilize dues only for the four functions stated therein. In my view, the appropriate and responsible course for the Bar is to temper its activities in response to the referendum, but to proceed in a manner consistent with its acknowledged public and professional obligations. This course preferably should be steered by the leadership of the Bar without undue intrusion by the court. I therefore would favor an order which makes it clear that the Bar must address certain demonstrated public and professional needs.

I vote against vacating the stay.